**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| TAWNA Z. NEALMAN, as the **Personal Representative of the Estate** of Benjamin Shelley Nealman, | : : : : | CIVIL ACTION NO. 1:15-CV-1579 (Chief Judge Conner) |
| **Plaintiff** | : : | |
| v. | : : | |
| RYAN P. LAUGHLIN, *et al.*, | : : | |
| **Defendants** | : | |

## MEMORANDUM

Plaintiff Tawna Z. Nealman brings this civil rights action on behalf of the estate of her late husband, Benjamin Shelley Nealman.  Plaintiff asserts various constitutional and state law claims arising from her husband's suicide during his detention in August 2013.  Before the court are three motions (Docs. 34-36) to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).  The court will grant in part and deny in part the pending motions.

## I.   Factual Background and Procedural History

The matter *sub judice* arises from allegations that the collective defendants were deliberately indifferent to the medical needs of plaintiff's decedent, Benjamin Shelley Nealman ("Nealman"), while Nealman was detained at Mifflin County Correctional Facility.  Plaintiff avers that defendants' deliberate indifference led to Nealman's preventable suicide.  The following factual narrative derives from plaintiff's amended complaint.  (Doc. 32).  In accordance with the Rule 12(b)(6)

standard of review articulated *infra*, the court will accept as true plaintiff's well-pleaded averments.

On August 11, 2013, Nealman was at his home in Juniata County, Pennsylvania, with his wife, plaintiff Tawna Z. Nealman, and their three children. (Doc. 32 ¶ 35; see id. ¶ 4). Nealman experienced delusions, believing that he heard voices from "people in the attic, and people jumping from roof to roof outside." (Id. ¶ 36). He became agitated and began running around the house in attempt to locate the source of the voices. (Id. ¶ 37). Nealman asked plaintiff whether she could hear "them crawling across the rafters." (Id. ¶ 38). Nealman's paranoia escalated, and he ran back into the house, mumbling under his breath and asking one of his minor children whether the child could see "them." (Id. ¶¶ 39-40). When Nealman again exited the house "to confront the imaginary people," plaintiff locked the front door. (Id. ¶ 41).

A neighbor concerned by the commotion called 911, and Pennsylvania state troopers responded to the call. (See id. ¶¶ 42-43). After the troopers arrived, plaintiff observed Nealman to be handcuffed and sitting down. (Id. ¶ 44). Plaintiff thereafter spoke with both troopers, reporting that Nealman was "out of his mind." (Id. ¶ 47). The troopers informed plaintiff that Nealman would "sleep it off at the neighbor's house" and encouraged plaintiff to seek a protection from abuse ("PFA") order "if this is how [Nealman] acted." (Id. ¶¶ 46-48).

Two days later, Nealman again encountered Pennsylvania state troopers. (See id. ¶ 50). At approximately 2:00 P.M. on August 13, 2013, state trooper Ryan P.

Laughlin ("Trooper Laughlin") and a second officer received a report that a "frantic male . . . had rushed into" a printing business in Juniata County, Pennsylvania. (Id.) Per the report, the individual was "hiding behind a table in the back of the business" and claiming he was being shot at by three other people. (Id.). Troopers arrived to find Nealman behind a table, clutching a stun gun and brass knuckles. (Id. ¶ 51). The responding troopers had not been involved in and were not aware of the police encounter with Nealman two days earlier. (Id. ¶¶ 52-53).

Nealman described having been pursued and shot several times in the back by three unidentified individuals and further reported that at least one bullet had struck his stun gun. (Id. ¶ 55). Neither trooper observed bullet wounds on Nealman or damage to his stun gun. (Id. ¶ 56). The troopers observed Nealman's pupils to be constricted and noted that he was "stuttering," "trembling," "sweating profusely," and "almost incoherent." (Id. ¶ 58). Nealman advised the troopers that he had ingested bath salts earlier that morning and had also taken Vicodin and No Doz caffeine pills. (Id. ¶ 59). Trooper Laughlin placed Nealman under arrest and transported him to Mifflin County Correctional Facility. (Id. ¶¶ 60, 62). Although Nealman was a Juniata County detainee, a prison services contract between Mifflin and Juniata County dictated that Nealman be taken to the Mifflin County facility. (Id. ¶¶ 23, 193-94).

 Mifflin County Correctional Facility maintains an Initial Inmate Reception Policy which requires that transporting officers remain at the facility until the detainee is "examined and deemed suitable for admission" by a shift supervisor or

booking officer.  (Id. ¶¶ 68-69).  The policy provides that either the shift supervisor or booking officer "will verify the inmate's medical suitability for admission."  (Id. ¶ 70).  Per the reception policy, a detainee is not medically suitable for admission if he or she presents with signs of "hallucinations, seizure activity, or other psychotic-psychosomatic behavior."  (Id. ¶ 71).  If a prospective detainee exhibits any such symptoms, he or she must be returned to the transporting officer and will not be admitted until the transporting officer obtains a medical clearance from a local hospital.  (Id. ¶¶ 72-73).  The institution also maintains a Suicide Prevention Policy, which requires booking officers or shift supervisors, upon commitment of a new detainee, to "evaluate the detainee's mental health status based upon personal observations and information reported by the arresting officer or the transporting authority."  (Id. ¶¶ 88-89).

Mifflin County corrections officials must further abide by a Classification Policy, which dictates procedures for proper custodial classification of inmates.  (Id. ¶¶ 117-18).  The policy provides that the classification process shall be completed by a panel of at least two persons, consisting of one treatment staff member and one security staff member.  (Id. ¶ 118).  Among other things, the policy requires that the medical department and a facility counselor complete the medical and mental health portions of the classification checklist form, respectively, and that personal observations of the detainee at reception be documented by the booking officer. (Id. ¶¶ 118-19).

4

Lieutenant Michelle K. Weaver ("Lieutenant Weaver") was the shift supervisor on duty when Nealman arrived at Mifflin County Correctional Facility on the evening of August 13, 2013, and Corrections Officer Robert Maben ("Officer Maben") was the booking officer.  (See id. ¶¶ 69-70).  According to the *allegata*, Lieutenant Weaver and Officer Maben did not ensure that Nealman received the required medical screening and did not complete the initial classification form.  (See id. ¶ 74).  LPN Carla Walters ("Nurse Walters"), the medical officer on duty, purportedly did not evaluate Nealman's medical condition, and the facility's counselor supervisor, Marlin G. Conner ("Counselor Conner"), purportedly did not conduct a mental health screening.  (See id. ¶¶ 13, 83, 123-24).  Instead, plaintiff avers that three other officials—Corrections Officer Christian Z. Snook ("Officer Snook"), LPN Tiffanie N. Wert ("Nurse Wert"), and Lieutenant Barry Kearns ("Lieutenant Kearns")—completed the initial reception form after a shift change the following day, "falsely indicating that they had completed the screening" after receiving Nealman from Trooper Laughlin.  (Id. ¶ 75).  At some point during the booking process, Officer Maben allegedly issued a knife, bedsheet, and pillowcase to Nealman.  (Id. ¶ 104; see also id. ¶¶ 133-34).

Plaintiff alleges that Trooper Laughlin failed to report to the receiving corrections officers that Nealman had exhibited "delusional, paranoid, [and] psychotic" behavior incident to arrest and was observed to be "stuttering, trembling, sweating profusely, and almost incoherent."  (Id. ¶ 77).  Nor did Trooper Laughlin convey that Nealman had ingested bath salts, Vicodin, and No Doz prior

to arrest.  (Id.)  Plaintiff alternatively alleges that Trooper Laughlin *did* relay this information and that the receiving officers independently observed Nealman's behavior during intake.  (Id. ¶¶ 78-80).  Despite their observations, Officer Snook and Nurse Wert recommended Nealman's initial placement in general population without special monitoring instructions.  (Id. ¶ 86).  Lieutenant Kearns initialed and approved the recommendation.  (Id. ¶ 87).

At 9:30 A.M. on August 14, 2013, Lieutenant Kearns, Nurse Wert, and Officer Snook conducted an "Initial Receiving Screening" of Nealman and prepared an initial screening form.  (Id. ¶ 108; see also Doc. 1-8).  The form notes that Nealman "snorted" bath salts on August 13, 2013, had previously been hospitalized for mental illness, and had attempted suicide by overdose in 2000.  (See Doc. 32 ¶¶ 109-110).  Notwithstanding this history, defendants did not refer Nealman for mental or medical health evaluations.  (Id. ¶¶ 111-12).  Instead, Lieutenant Kearns, Nurse Wert, and Officer Snook classified Nealman to general population housing.  (See id. ¶ 111).  Nurse Wert conducted a physical examination later that day, at 1:25 P.M., noting Nealman's "use of Bath Salts on occasion."  (Id. ¶¶ 115-16).  No mental health professional ever evaluated Nealman's mental health.  (Id. ¶ 92).

Corrections Officer Joseph T. Patkalitsky, Jr. ("Officer Patkalitsky"), assigned Nealman cell E-201 at 10:00 A.M. on August 15, 2013.  (Id. ¶ 127).  Pursuant to an Interior Security Checks Policy, correction officers must "make routine rounds within the housing units at least every hour, at irregular intervals, monitoring inmate behavior and being constantly alert and observant of any changes in inmate

behaviors and attitudes." (<u>Id.</u> ¶ 129).  Control officers "monitor inmate behavior on the camera monitors and via the intercom system." (<u>Id.</u>)  Corrections Officers James Lewis ("Officer Lewis"), Robert E. Knable ("Officer Knable"), and Zachary R. Houser ("Officer Houser") were responsible for making rounds to check on Nealman on August 16, 2013, and Officer Patkalitsky was the shift's control officer. (<u>Id.</u> ¶¶ 129-30).  According to plaintiff, Sergeant Dustin Benny ("Sergeant Benny"), Deputy Warden James T. Crisswell ("Deputy Warden Crisswell"), and Warden Bernard J. Zook ("Warden Zook") supervised the corrections and control officers on duty. (<u>Id.</u> ¶ 130).  Plaintiff avers that these officers knew Nealman was suffering "a mental health emergency and was suicidal" but "failed to constantly monitor" him. (<u>Id.</u> ¶¶ 130-31).

Nealman hung himself from the top bunk in cell E-201 on August 16, 2013, using the bedsheet and pillowcase issued to him by Officer Maben. (<u>See id.</u> ¶¶ 133 -34).  Nealman also used the facility-issued knife to cut his left wrist. (<u>Id.</u>)  Officer Lewis discovered Nealman hanging unconscious in his cell at approximately 12:37 P.M., at which point several defendants attempted to revive him. (<u>Id.</u> ¶¶ 135, 137, 140).  Emergency medical services responded and assumed control of Nealman's treatment, transporting him first to Geisinger-Lewistown Hospital and later to Geisinger Medical Center. (<u>Id.</u> ¶¶ 138-39).  Nealman never regained consciousness. (<u>Id.</u> ¶ 140).  On August 20, 2013, Nealman was diagnosed to be brain dead, and the decision was made to terminate his life support. (<u>Id.</u> ¶¶ 141-42).

Plaintiff commenced the instant action on August 12, 2015, and filed an amended complaint on November 11, 2015.  (Docs. 1, 32).  Plaintiff names three categories of individuals and institutional entities as defendants: (1) the Mifflin County defendants, comprising Officers Maben, Snook, Patkalitsky, Lewis, Knable, and Houser; Nurses Wert and Walters; Counselor Conner; Lieutenants Weaver and Kearns; Sergeant Benny; Deputy Warden Crisswell; and Warden Zook; as well as Mifflin County and the Mifflin County Prison Board; (2) the Commonwealth defendants, which include Trooper Laughlin and Pennsylvania State Police Commissioner Frank Noonan ("Commissioner Noonan"); and (3) Juniata County, Pennsylvania.  (See Doc. 32 ¶¶ 5-23).

Plaintiff asserts Fourteenth Amendment due process claims pursuant to 42 U.S.C. § 1983 against all defendants (Counts I-III), a state law medical negligence claim against Counselor Conner and Nurses Wert and Walters (Count IV), and a state law wrongful death claim against all defendants (Count V).  In three separate motions (Docs. 34-36), defendants seek dismissal of plaintiff's claims under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  The Mifflin County defendants also move to strike certain paragraphs from plaintiff's pleading under Rule 12(f).  The motions are fully briefed and ripe for disposition.

## II.   <u>Legal Standard</u>

### A.   **Motion to Dismiss**

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for the dismissal of complaints that fail to state a claim upon which relief may be granted.

8

FED. R. CIV. P. 12(b)(6).  When ruling on a motion to dismiss under Rule 12(b)(6), the court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."  Phillips v. Cty. of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008).

Federal notice and pleading rules require the complaint to provide "the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Phillips, 515 F.3d at 232 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  To test the sufficiency of the complaint, the court must conduct a three-step inquiry.  See Santiago v. Warminster Twp., 629 F.3d 121, 130-31 (3d Cir. 2010).  In the first step, "the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.' "  Id. at 130 (quoting Ashcroft v. Iqbal, 556 U.S. 662, 675 (2009)).  Next, the factual and legal elements of a claim should be separated; well-pleaded facts must be accepted as true, while mere legal conclusions may be disregarded.  Id. at 131; see also Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009).  Once the court isolates the well-pleaded factual allegations, it must determine whether they are sufficient to show a "plausible claim for relief."  Iqbal, 556 U.S. at 679 (citing Twombly, 550 U.S. at 556); Twombly, 550 U.S. at 555.  A claim "has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678.  In addition to reviewing the facts contained in the complaint, the court may also consider "matters of public record, orders, exhibits attached to

the complaint and items appearing in the record of the case." <u>Oshiver v. Levin,</u>

<u>Fishbein, Sedran & Berman</u>, 38 F.3d 1380, 1384 n.2 (3d Cir. 1994); <u>Pension Ben.</u>

<u>Guar. Corp. v. White Consol. Indus., Inc.</u>, 998 F.2d 1192, 1196 (3d Cir. 1993).

Courts should grant leave to amend before dismissing a curable pleading in

civil rights actions.  <u>See</u> <u>Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.</u>,

482 F.3d 247, 251 (3d Cir. 2007); <u>Grayson v. Mayview State Hosp.</u>, 293 F.3d 103, 108

(3d Cir. 2002).  Courts need not grant leave to amend *sua sponte* in dismissing

non-civil rights claims pursuant to Rule 12(b)(6), <u>Fletcher-Harlee Corp.</u>, 482 F.3d

at 251, but leave is broadly encouraged "when justice so requires."  FED. R. CIV. P.

15(a)(2).

B.     **Motion to Strike**

Under Federal Rule of Civil Procedure 12(f), the court may strike from a

pleading "any redundant, immaterial, impertinent, or scandalous matter."  FED. R.

CIV. P. 12(f).  District courts have "considerable discretion" in resolving a Rule 12(f)

motion.  <u>Krisa v. Equitable Life Assurance Soc'y</u>, 109 F. Supp. 2d 316, 319 (M.D. Pa.

2000) (quoting <u>N. Penn. Transfer, Inc. v. Victaulic Co. of Am.</u>, 859 F. Supp. 154, 158

(E.D. Pa. 1994)).  In general, such a motion will be denied unless the allegations are

severely prejudicial to one of the parties and unrelated to the plaintiff's claims.  <u>Id.</u>;

<u>see</u> <u>also</u> 5C CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE & PROCEDURE § 1382

(3d ed. 2016).  A party is prejudiced when the challenged pleading "confuses the

issues" or places an undue burden on the responding party.  <u>Karpov v. Karpov</u>, 307

F.R.D. 345, 348 (D. Del. 2015).

## III.   Discussion

The collective defendants' motions, *in extenso*, challenge the sufficiency of each count of plaintiff's amended pleading.  The court will address defendants' manifold Rule 12 contentions *seriatim*.

### A.   Section 1983 Claim

Section 1983 of Title 42 of the United States Code provides a cause of action to redress violations of federal law committed by state officials.  See 42 U.S.C. § 1983.  Section 1983 is not a source of substantive rights, but merely a method for vindicating those rights otherwise protected by federal law.  Gonzaga Univ. v. Doe, 536 U.S. 273, 284-85 (2002); Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996).  To establish a claim under Section 1983, plaintiff must show a deprivation of a "right secured by the Constitution and the laws of the United States . . . by a person acting under color of state law."  Kneipp, 95 F.3d at 1204 (quoting Mark v. Borough of Hatboro, 51 F.3d 1137, 1141 (3d Cir. 1995)).  There is no dispute that all defendants at bar are state actors within the purview of Section 1983.  (See Doc. 32 ¶¶ 5-20).

Plaintiff catalogues her Section 1983 claims into three categories: individual liability (Count I), supervisory liability (Count II), and municipal liability (Count III). The court will examine plaintiff's constitutional claims and defendants' challenges thereto in turn.

### 1.   *Individual Liability*

In Count I, plaintiff asserts a Fourteenth Amendment claim for denial of medical care against thirteen defendants: Trooper Laughlin; Officers Maben,

Snook, Patkalitsky, Lewis, Knable, and Houser; Nurses Wert and Walters;

Counselor Conner; Lieutenants Weaver and Kearns; and Sergeant Benny.[1]  Each

individual defendant disputes whether plaintiff's amended complaint sufficiently

states a claim against them.  (Doc. 40 at 3-10; Doc. 41 at 20-22).  Trooper Laughlin

additionally asserts that he is entitled to qualified immunity.  (Doc. 41 at 10-17).  The

court first evaluates Trooper Laughlin's asserted defense to suit before assessing

the merits of plaintiff's claim against the individual defendants.

### a.    Trooper Laughlin

Qualified immunity protects a state actor who has committed constitutional

violations if the plaintiff's rights were not clearly established when the individual

acted.  Pearson v. Callahan, 555 U.S. 223, 244-45 (2009).  No liability will attach if a

reasonable state actor could have believed that the challenged conduct was in

compliance with settled law.  Id.; see also Springer v. Henry, 435 F.3d 268, 280 (3d

Cir. 2006).  The doctrine cloaks government officials with "immunity from suit

rather than a mere defense to liability," Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)

(emphasis omitted), and "ensure[s] that insubstantial claims against government

---

[1] Count I of plaintiff's amended complaint also refers to a "failure to protect" in violation of the Fourteenth Amendment.  (See Doc. 32 at 26).  The Mifflin County defendants move for dismissal of this claim as duplicative of the denial of medical care claim raised in the same count, (see Doc. 40 at 9-10), and plaintiff does not respond to defendants' argument.  (See generally Doc. 44).  District courts routinely deem claims to be waived or abandoned when litigants fail to defend the claim in response to a dispositive motion.  See Brice v. City of York, 528 F. Supp. 2d 504, 518 n.19 (M.D. Pa. 2007) (citing D'Angio v. Borough of Nescopeck, 34 F. Supp. 2d 256, 265 (M.D. Pa. 1999)); Brown v. Pa. State Dep't of Health, 514 F. Supp. 2d 675, 678 n.7 (M.D. Pa. 2007) (same).  The court deems plaintiff to have abandoned any failure to protect claim.

officials [will] be resolved prior to discovery."  Pearson, 555 U.S. at 231-32 (quoting

Anderson v. Creighton, 483 U.S. 635, 640 n.2 (1987)).  The doctrine generally

"protects 'all but the plainly incompetent or those who knowingly violate the law.'"

Ashcroft v. al-Kidd, 563 U.S. 731, 743 (2011) (quoting Malley v. Briggs, 475 U.S. 335,

341 (1986)).  The burden to establish qualified immunity rests with the defendant.

Beers-Capitol v. Whetzel, 256 F.3d 120, 142 n.15 (3d Cir. 2001).

    A court evaluating a claim of qualified immunity considers two distinct

inquiries: *first*, whether, based on the facts alleged, a constitutional right has been

violated and, *second*, if so, whether the right was "clearly established" at the time of

the alleged violation.  Spady v. Bethlehem Area Sch. Dist., 800 F.3d 633, 637 (3d Cir.

2015) (quoting Pearson, 555 U.S. at 232).  A court may begin its qualified immunity

analysis with either prong.  See Pearson, 555 U.S. at 237.  In Pearson, the Supreme

Court recognized that, in certain circumstances, a case may be easily resolved by

addressing the clearly established prong at the outset.  See id.  Such is the case with

Trooper Laughlin's asserted qualified immunity defense.

    A court must "frame the precise contours" of the right at issue before

determining whether that right is clearly established.  Spady, 800 F.3d at 638.  A

Section 1983 plaintiff need not produce a directly analogous case to prove that a

right is clearly established, but there must exist Supreme Court precedent or a

"robust consensus of cases of persuasive authority" at the time of the challenged

conduct to "place[] the . . . constitutional question beyond debate."  Taylor v.

Barkes, 575 U.S. __, 135 S. Ct. 2042, 2044 (2015) (*per curiam*).  Courts must exercise

care "not to define clearly established law at a high level of generality." al-Kidd, 563 U.S. at 742.  Rather, courts must endeavor to frame the right at issue in light of the specific context of the matter at bar.  See Spady, 800 F.3d at 638 (quoting Saucier v. Katz, 533 U.S. 194, 201 (2001); Anderson, 483 U.S. at 639).

Trooper Laughlin narrowly tailors the constitutional question *sub judice*, observing that, at the time of Nealman's arrest, no decisional law existed which affirmatively required arresting officers to ensure proper psychological screening or treatment of arrestees known to be under the influence of bath salts to prevent suicide attempts during later incarceration.  (Doc. 41 at 13-15).  Plaintiff makes no reciprocal effort to carefully define the perceived right "at the appropriate level of specificity." Spady, 800 F.3d at 638.  *Per contra*, plaintiff casts her claim as one for denial of the right to medical care generally, asserting: "A detainee is entitled under the Due Process Clause of the Fourteenth Amendment to, at a minimum, . . . no less a level of medical care than that required for convicted prisoners by the Eighth Amendment."  (Doc. 44 at 3 (quoting Colburn v. Upper Darby Twp. ("Colburn I"), 838 F.2d 663, 668 (3d Cir. 1988))).

To adopt plaintiff's abstract characterization of her claim against Trooper Laughlin would vitiate the requirement that courts frame constitutional inquiries "in light of the case's specific context, *not* as a broad general proposition." Spady, 800 F.3d at 638 (quoting Saucier, 553 U.S. at 201).  The Third Circuit Court of Appeals has cautioned that accepting such generic definitions would allow litigants to transform qualified immunity "into a rule of virtually unqualified liability by

simply alleging violation of extremely abstract rights." Spady, 800 F.3d at 638 (quoting Anderson, 483 U.S. at 639).  Consequently, the court regularly rejects efforts—like the instant plaintiff's—to define clearly established rights in sweeping constitutional generalities.  See, e.g., Michtavi v. Scism, 808 F.3d 203, 206-07 (3d Cir. 2015); Spady, 800 F.3d at 638-39.

The court finds that a properly tailored definition of the issue, based upon plaintiff's *allegata*, is as follows: whether an arresting officer, with no knowledge of an arrestee's mental health history and no medical expertise, has a duty to ensure post-arrest psychological assessment and treatment of a detainee who exhibits erratic and delusional behavior consistent with his or her known intoxication.[2]  This definition contextually aligns with the facts of this case and the specific claim against Trooper Laughlin, and derives from plaintiff's allegations that Trooper Laughlin: "ignored [Nealman's] delusional, paranoid, and psychotic behavior"; "failed to transport [Nealman] to the hospital for appropriate medical treatment"; "failed to advise [the Mifflin County defendants] of [Nealman's] delusional, paranoid, and psychotic behavior, and his obvious need for medical treatment"; and "instead of calling an ambulance or transporting [Nealman] to an appropriate medical facility, Trooper Laughlin filed criminal charges against him, and transported him to the Mifflin County Correctional Facility."  (Doc. 32 ¶ 168).

---

[2] Trooper Laughlin defines the perceived right even more precisely, restricting its scope to include only "arrestees high on bath salts."  (Doc. 41 at 14). The court declines to adopt the narrow definition proposed by Trooper Laughlin in light of the Supreme Court's recognition that Section 1983 plaintiffs need not produce "a case *directly* on point."  al-Kidd, 563 U.S. at 741 (emphasis added).

15

Plaintiff identifies neither Supreme Court precedent nor a "robust consensus" among the Courts of Appeals establishing that such perceived failures are wrongs of a constitutional dimension. (See generally Doc. 44). Indeed, plaintiff does not identify any decisional law even remotely analogous to the constitutional claim she lodges. (Id.) The court's independent research confirms defendants' assertion that no such authority exists. As a consequence, Trooper Laughlin is entitled to qualified immunity on plaintiff's Fourteenth Amendment claim.[3]

### b.  Mifflin County Defendants

There is no debate, however, that the suicide of a pretrial detainee may support a Fourteenth Amendment claim against custodial officers who are aware of and act with reckless indifference to a detainee's "particularized vulnerability" to suicide. The Third Circuit Court of Appeals recognized liability for such claims in Colburn I, and later elaborated on the applicable standard in Colburn v. Upper Darby Township ("Colburn II"), 946 F.2d 1017 (3d Cir. 1991), and Woloszyn v. County of Lawrence, 396 F.3d 314 (3d Cir. 2005). The Mifflin County defendants do not dispute this proposition. (Doc. 40 at 4-5). Instead, the individual corrections defendants maintain that plaintiff fails to plead sufficient facts to establish a *prima facie* claim under the settled law. (See id. at 5-9).

---

[3] To the extent plaintiff attempts to assert a claim against Trooper Laughlin for deliberate indifference to a known and particularized risk of suicide, (see Doc. 44 at 3 (quoting Colburn I, 838 F.2d at 668)), her pleading fails to state such a claim. Plaintiff concedes that Trooper Laughlin did not know of Nealman's encounter with law enforcement two days prior to his arrest, (Doc. 32 ¶¶ 53), and does not allege that Trooper Laughlin knew of Nealman's prior mental health hospitalization, prior suicide attempt, or his then-extant depressive state and marital problems.

To establish liability under Section 1983 for a detainee's suicide, a plaintiff must allege: *first*, the detainee had a "particular vulnerability" to suicide; *second*, custodial officers knew of said vulnerability; and *third*, the officers "acted with reckless indifference" to the known risk of suicide.  Woloszyn, 396 F.3d at 319 (quoting Colburn II, 946 F.2d at 1023); see also Taylor, 135 S. Ct. at 2046 (citing Serafin v. City of Johnstown, 53 F. App'x 211, 213 (3d Cir. 2002) (nonprecedential)). The particular vulnerability standard requires "a strong likelihood, rather than a mere possibility," that the detainee will engage in self-harm.  Colburn II, 946 F.2d at 1024.  Allegations that a detainee belonged to a demographic that correlates with higher rates of suicide will not suffice to make this showing.  See, e.g., Wargo v. Schuylkill Cty., 348 F. App'x 756, 759 (3d Cir. 2009) (nonprecedential); Thomas v. Fayette Cty., No. 2:14-CV-551, 2016 WL 3639887, at *13 (W.D. Pa. July 8, 2016). Rather, plaintiff must allege sufficient facts from which custodial officers should have known that the *particular* detainee was inclined toward self-harm.

Plaintiff identifies several factors in support of her contention that Nealman presented with a propensity toward suicide, *to wit*: (1) Nealman "snorted" bath salts on August 13, 2013, a drug "known to cause reoccurring delusional, paranoid, and psychotic behavior"; (2) Nealman in fact exhibited such behavior; (3) Nealman was experiencing marital problems and his family members would not bail him out of jail; and (4) Nealman was depressed, had a prior mental health hospitalization, and had previously attempted to commit suicide.  (Doc. 32 ¶ 163).  Assuming the truth of plaintiff's allegations, the individual Mifflin County defendants argue that the

cumulative circumstances do not signal a particular vulnerability toward suicide. (Doc. 40 at 5-9).

Plaintiff acknowledges that any one of these factors in isolation may not demonstrate the requisite level of vulnerability. (See Doc. 32 ¶ 164; see also Doc. 44 at 5). Case law supports this threshold concession. In Colburn II, for example, the Third Circuit rejected a plaintiff's attempt "to equate intoxication. . . with 'a particular vulnerability to suicide.'" Colburn II, 946 F.2d at 1026. Similarly, in Woloszyn, the appellate court granted summary judgment to custodial defendants when the only evidence presented to demonstrate the detainee's susceptibility to suicide was his intoxication and a passing indication of familial distress. See Woloszyn, 396 F.3d at 322-23. The court agrees that any of the circumstantial elements enumerated by plaintiff, in isolation, could not establish a particularized vulnerability to suicide.

But plaintiff does not assert these indicators in isolation. It is plaintiff's contention that Nealman's known delusional and psychotic behavior—combined with then-recent marital discord and a medical history including depression, a previous mental health hospitalization, and a prior suicide attempt—coalesce to satisfy her pleading burden. (See Doc. 44 at 4-5). In Colburn II, the Third Circuit intimated that intoxication plus "additional factor[s]" may constitute sufficient evidence of a particularized vulnerability. See Colburn II, 946 F.2d at 1026-27. At this preliminary juncture, the court agrees with plaintiff that Nealman may have been particularly vulnerable to self-harm and suicide in August 2013.

This holding does not end the court's inquiry, however, because plaintiff must further allege that each individual defendant knew or should have known of Nealman's suicidal propensities. See Woloszyn, 396 F.3d at 320 (quoting Colburn II, 946 F.2d at 1024-25). It is this element which winnows the permissible scope of liability *sub judice*.

Viewing the facts in the light most favorable to plaintiff, the amended complaint alleges actual or putative knowledge on behalf of less than half of the individual Mifflin County defendants. Defendants with knowledge include Officer Maben and Lieutenant Weaver, the officials who received Nealman from Trooper Laughlin and conducted his initial booking, and Officer Snook, Lieutenant Kearns, and Nurse Wert, who completed Nealman's initial classification paperwork. (See Doc. 32 ¶¶ 74-75, 78-80, 108-110, 117). According to the amended complaint, each of these individuals had knowledge of Nealman's prior suicide attempt and mental health hospitalization, as well as his recent use of bath salts and his attendant delusional, paranoid, and psychotic behavior. (Id.) Moreover, plaintiff avers that these defendants actually observed Nealman's delusional and psychotic behavior when he arrived at the Mifflin County Correctional Facility. (See id. ¶ 80). These allegations are sufficient to establish knowledge on behalf of Officers Maben and Snook, Lieutenants Weaver and Kearns, and Nurse Wert.

However, the amended complaint is silent as to whether the remaining individual defendants knew —and if not, why they should have known—of Nealman's particularized vulnerability to suicide. Plaintiff alleges no facts

attributing knowledge of Nealman's intoxication and associated behaviors, his mental state, or his prior attempted suicide to Nurse Walters, Counselor Conner, Officers Patkalitsky, Lewis, Knable, and Houser, or Sergeant Benny. Hence, the court is compelled to grant the Mifflin County defendants' motion with respect to each of these individuals.

The court also must determine whether the amended complaint alleges reckless indifference on behalf of those defendants with knowledge of Nealman's particular vulnerability to suicide. See Woloszyn, 396 F.3d at 320; Colburn II, 946 F.2d at 1024-25. Plaintiff claims that, despite defendants' knowledge of Nealman's mental state and potential for self-harm, defendants failed to provide immediate medical treatment and instead issued Nealman the knife that he later used to cut his wrist and the bedsheet and pillowcase that he later used to hang himself. (Doc. 32 ¶¶ 28, 104, 133-34). Assuming these allegations to be true, defendants' actions may rise to the level of deliberate indifference contemplated by Colburn II and Woloszyn.

Finally, Lieutenants Weaver and Kearns and Officers Maben and Snook contend that their actions could not have been recklessly indifferent because they were entitled to rely on the medical opinion of Nurse Wert. (See Doc. 40 at 14-16). Determinations of whether such reliance is reasonable are most appropriately made with the benefit of a fully developed record at the Rule 56 stage of litigation. See, e.g., Thomas, 2016 WL 3639887, at *17; Francis *ex rel.* Francis v. Northumberland

Cty., 636 F. Supp. 2d 368, 399-400 (M.D. Pa. 2009). The court will deny the non-medical defendants' motion without prejudice to this extent.

### 2. *Supervisory Liability*

A supervisory defendant in a Section 1983 action may not be held liable merely on a theory of *respondeat superior*. Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988). Supervisory liability under Section 1983 will only attach in one of two ways: (1) the supervisor "with deliberate indifference to the consequences, established and maintained a policy, practice[,] or custom" that directly caused the alleged constitutional violation; or (2) the supervisor participated in or directed the alleged violation or "had knowledge of and acquiesced in" the unconstitutional conduct of a subordinate. Barkes v. First Corr. Med., Inc., 766 F.3d 307, 316 (3d Cir. 2014), rev'd on other grounds by Taylor, 135 S. Ct. 2042. Plaintiff raises supervisory liability claims against Commissioner Noonan, as well as Lieutenants Weaver and Kearns, Sergeant Benny, Deputy Warden Crisswell, and Warden Zook.

#### a. **Commissioner Noonan**

Commissioner Noonan asserts a twofold defense to plaintiff's supervisory liability claim: *first*, the Commissioner contends that he is entitled to qualified immunity because no clearly established decisional law establishes a right to suicide prevention screenings or protocols for intoxicated detainees; *second*, and alternatively, the Commissioner eschews plaintiff's allegations as purely conclusory. Plaintiff answers cursorily that the Commissioner "was deliberately indifferent to

known deficiencies in his governance of" the Pennsylvania State Police.  (Doc. 44 at 9-10).

As elucidated *supra*, a government official sued in his individual capacity is entitled to qualified immunity from suit when the constitutional violation charged by a plaintiff was not clearly established at the time of the alleged wrongdoing. Spady, 800 F.3d at 637 (quoting Pearson, 555 U.S. at 232).  This analysis requires plaintiff to present sufficient persuasive or precedential authority placing the constitutionality of challenged conduct "beyond debate."  Taylor, 135 S. Ct. at 2044. Plaintiff attempts to meet this burden by pleading that Commissioner Noonan failed to train state troopers "to recognize and not ignore obvious medical needs of detainees with known, demonstrable, and serious medical disorders" in violation of the Fourteenth Amendment right to adequate medical care.  (Doc. 32 ¶ 181; Doc. 44 at 3).  She suggests broadly that Commissioner Noonan was deliberately indifferent to and "allowed to develop an environment in which there is an unreasonable risk that a constitutional injury will occur."  (Doc. 44 at 8-9 (quoting Barkes, 766 F.3d at 320)).

Plaintiff again defines the alleged constitutional violation at too high a level of generality.  See al-Kidd, 563 U.S. at 742.  As concerns Commissioner Noonan, the purported supervisory violation is derivative of the claim against Trooper Laughlin.  Accordingly, plaintiff must first establish that arresting officers are constitutionally obligated to ensure proper, post-arrest psychological assessment and treatment of intoxicated detainees exhibiting erratic behavior; she then must

further demonstrate that Commissioner Noonan knew that Pennsylvania State Police policy was deficient to protect this established right and was deliberately indifferent to those deficiencies.  See Barkes, 766 F.3d at 319-20.

For all of the reasons discussed *supra*, plaintiff's amended complaint fails to meet this burden.  At the time of Nealman's arrest in 2013, no decisional law existed which clearly obliged arresting officers to evaluate intoxicated detainees for latent suicidal tendencies.  See *supra* at pp. 13-16.  Ergo, Commissioner Noonan's alleged failure to enact official policy requiring such affirmative action by troopers does not, as a matter of law, violate a clearly established constitutional right.  Commissioner Noonan is entitled to qualified immunity.

### b.   Mifflin County Supervisory Defendants

Plaintiff alleges that the supervisory Mifflin County defendants "were tasked with overseeing the intake/booking process, the inmate housing classification, and inmate personal security," "knew that prison policies were being ignored," and "signed off on documents that facially were deficient and knowingly false."  (Doc. 32 ¶¶ 185-88).  As set forth above, plaintiff cannot premise her claim against these defendants on a theory of vicarious liability.  She must instead demonstrate that each defendant either established a policy that caused the alleged constitutional violation or was personally involved in the violation by participation, direction, or acquiescence.  See Barkes, 766 F.3d at 316.

The Mifflin County supervisory defendants argue as a threshold matter that plaintiff's alleged injury derives from purported noncompliance with preventative

policies, *not* enactment of policies which jeopardize a constitutional right.  (Doc. 40 at 10-12).  Plaintiff concedes this point in her opposition brief, but maintains that she "has alleged sufficient personal involvement of these supervisors" to proceed on the second theory of supervisory liability.  (See Doc. 44 at 9).  Hence, the court will measure plaintiff's claim against Lieutenants Weaver and Kearns, Sergeant Benny, Deputy Warden Crisswell, and Warden Zook exclusively as a personal involvement claim.

The court finds that plaintiff has sufficiently alleged personal involvement of Lieutenants Weaver and Kearns in their supervisory capacities.  Plaintiff avers that Lieutenant Weaver knew of Nealman's vulnerability to suicide but nonetheless failed to document Nealman's behaviors and propensities during the intake and booking process.  (See Doc. 32 ¶¶ 74, 120).  Plaintiff further asserts that Lieutenant Kearns, in possession of the same knowledge, approved reception and classification forms that were silent concerning Nealman's symptomatology.  (See id. ¶¶ 74-75, 78-80, 86, 120).  Plaintiff's claim against Lieutenants Weaver and Kearns survives Rule 12 scrutiny.

The same cannot be said of plaintiff's allegations against Sergeant Benny, Deputy Warden Crisswell, or Warden Zook, which represent nothing more than a blanket assertion of *respondeat superior* liability.  Beyond identifying their roles as supervisory officials, the amended complaint is wholly devoid of any allegation that either Sergeant Benny, Deputy Warden Crisswell, or Warden Zook participated in, directed, or was aware of and acquiesced in the constitutional violation charged in

this case.  (See id. ¶¶ 15, 18-19, 130-31).  Plaintiff's allegations thus fall well short of establishing the requisite personal involvement for a supervisory liability claim. See Barkes, 766 F.3d at 32; Rode, 845 F.2d at 1207.  The court will dismiss Count II as to Sergeant Benny, Deputy Warden Crisswell, and Warden Zook.

### 3.  *Municipal Liability*

Municipalities and other local government entities likewise may not be held liable in a Section 1983 suit for conduct of their employees under a theory of *respondeat superior* or vicarious liability.  Bd. of Cty. Comm'rs v. Brown, 520 U.S. 397, 403 (1997) (citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 692 (1978)); see also Colburn II, 946 F.2d at 1027.  Municipal liability only arises when a government causes an employee to violate another's constitutional rights by an official custom or policy.  See Monell, 436 U.S. at 690-94; Montgomery v. De Simone, 159 F.3d 120, 126 (3d Cir. 1998).  To establish liability under Monell, a plaintiff must identify the challenged policy or custom, attribute it to the municipality itself, and establish "a causal link" between the policy or custom and the constitutional injury alleged. Losch v. Borough of Parkesburg, 736 F.2d 903, 910 (3d Cir. 1984).

### a.  **Mifflin County and Mifflin County Prison Board**

Plaintiff sets forth several perceived policy defects in support of her Monell claim against Mifflin County and its Prison Board, including alleged deficiencies in existing policies, derogation from current and ostensibly adequate policies, and failure to institute new policies.  (See Doc. 32 ¶ 204).  Plaintiff contends that the Suicide Prevention Policy fails to define "suicidal behavior" or articulate with

25

specificity which individuals are qualified to perform the initial mental health assessment and that the classification checklist fails to specify a threshold number of mental health indicators necessary to trigger a treatment referral.  (Id. ¶ 204(b) -(d); see id. ¶¶ 105-06).  She also suggests that corrections staff regularly failed to comply with prison policy and "had a practice of falsifying documents," and that supervisory officials "had a custom of approving incomplete and falsified forms." (Id. ¶ 204(f)-(h)).  Further, plaintiff alleges that the municipal defendants were aware of the "Bath Salts epidemic" but "failed to enact a policy to address the Bath Salts issue."  (Id. ¶ 204(e)).  Defendants maintain that the amended complaint fails to state a viable claim for municipal liability.[4]

Essential to any successful Monell claim is the requirement that the allegedly deficient policy or custom was the "moving force" behind an alleged injury.  Monell, 436 U.S. at 694.  Thus, assuming *arguendo* that the deficiencies cited by plaintiff are defects of constitutional proportion—an assumption defendants dispute—plaintiff must nonetheless establish causation between the purported deficiencies and the injury she claims.  Losch, 736 F.2d at 910.

---

[4] Mifflin County and the Mifflin County Prison Board cursorily contend that they are entitled to qualified immunity in the wake of Taylor, 135 S. Ct. 2042.  (Doc. 40 at 13 n.3).  In Taylor, the Supreme Court determined that, as of 2004, prisoners did not possess a clearly established constitutional right to "suicide screening or prevention protocols."  Taylor, 135 S. Ct. at 2044.  However, Taylor did not disturb settled law within the Third Circuit imposing an obligation on corrections officers not to act with reckless indifference to a *known* risk of suicide.  See id. at 2045. Moreover, qualified immunity is only available to government officials sued in their individual capacities; municipal entities and agencies, such as Mifflin County and its Prison Board, cannot claim the doctrine's protection.  Carver v. Foerster, 102 F.3d 96, 102 (3d Cir. 1996) (citing Owen v. City of Independence, 445 U.S. 622 (1980)); Duran v. Merline, 923 F. Supp. 2d 702, 718 (D.N.J. 2013).

The bulk of plaintiff's municipal liability claims collapse against this requirement.  Plaintiff fails to causally connect any perceived policy defect with the ultimate harm she alleges.  Indeed, the only reasonable inference to be gleaned from the amended complaint is that plaintiff's alleged harm flows from a failure of individual employees to comply with government policy—*not* from a lack of specificity in the policy itself.  (Doc. 32 ¶¶ 68-132).  It is well-settled that an employee's deviation from existing policy cannot, without more, establish the requisite causal link between the alleged constitutional harm and the municipality —only when a governmental policy *itself* effects an injury may a municipality be held to account under Section 1983.  See Monell, 436 U.S. at 691.  Plaintiff thus fails to state a claim for municipal liability based upon purported defects in Mifflin County's correctional policies.

The only municipal liability theory of plausible merit is plaintiff's claim that Mifflin County and its Prison Board enacted a policy or sanctioned a custom whereby custodial officers were allowed to disregard institutional policy.  (See Doc. 32 ¶¶ 204(f), 206; see also Doc. 44 at 10).  Under Monell, a "policy" exists "when a decisionmaker possess[ing] final authority to establish . . . public policy with respect to the action issues an official proclamation, policy[,] or edict."  Natale v. Camden Cty. Corr. Facility, 318 F.3d 575, 584 (3d Cir. 2003) (quoting Kneipp, 95 F.3d at 1212). A custom, by contrast, is "an act 'that has not been formally approved by an appropriate decisionmaker,' but that is 'so widespread as to have the force of law.'" Id. (quoting Brown, 520 U.S. at 404).  A plaintiff proceeding on an unofficial custom

theory must allege facts tending to establish that "the [municipality] knew of a pattern of constitutional violations or that such consequences were so obvious the [municipality's] conduct can only be described as deliberate indifference." <u>Pelzer v. City of Phila.</u>, 656 F. Supp. 2d 517, 533 (E.D. Pa. 2009).

The amended complaint lacks sufficient factual allegations to undergird plaintiff's assertion that defendants maintained a policy or custom of "not adhering to or enforcing" other policies. (<u>See</u> Doc. 44 at 10). The pleading permits no inference that Mifflin County or its Prison Board issued "an official proclamation, policy[,] or edict" relieving employees of their obligation to comply with the facility's intake, booking, suicide prevention, or classification policies. <u>See</u> <u>Natale</u>, 318 F.3d at 584. Nor does plaintiff allege that noncompliance with said policies was prevalent, recurring, and silently sanctioned by municipal decisionmakers. <u>See</u> <u>id.</u> Without specific facts relating the asserted constitutional harm to an established municipal policy or custom, the court must dismiss plaintiff's <u>Monell</u> claim against Mifflin County and the Mifflin County Prison Board.[5]

### b.    <u>Juniata County</u>

Plaintiff's municipal liability claims against Juniata County are derivative of her claims against Mifflin County and the Mifflin County Prison Board. Plaintiff's amended complaint contains a sum total of three allegations concerning Juniata

---

[5] The court will summarily dismiss plaintiff's claim that the municipal defendants' failed to enact an appropriate policy in the wake of "the Bath Salts epidemic." (Doc. 32 ¶ 204(e)). Plaintiff offers neither factual nor legal foothold for this theory of municipal liability and fails to support this aspect of her <u>Monell</u> claim in her Rule 12 opposition papers. (<u>See</u> <u>generally</u> Docs. 32, 44).

County: (1) in July 2012, Juniata County closed its own municipal prison and contracted with Mifflin County for prison services; (2) Juniata County "failed to verify" whether Mifflin County would provide inmates with adequate medical care and personal protection; and (3) Juniata County did not exercise "due diligence to ensure that Mifflin County would provide constitutionally mandated protections and services to Juniata County inmates." (Doc. 32 ¶¶ 193, 196-97). The court has determined that plaintiff fails to state viable municipal liability claims against Mifflin County and its Prison Board. Hence, the court will dismiss plaintiff's derivative municipal liability claim against Juniata County.

### B.    State Law Claims

In addition to her Section 1983 claims, plaintiff asserts a state law medical negligence claim (Count IV) against Nurse Wert, Nurse Walters, and Counselor Conner, and a wrongful death claim (Count V) against all defendants.[6] (Doc. 32 ¶¶ 215-28). All defendants raise immunity defenses to plaintiff's state law tort claims. The court will address defendants' arguments *seriatim*.

### 1.    *Sovereign Immunity*

The Commonwealth defendants argue that plaintiff's tort claims against Trooper Laughlin and Commissioner Noonan are barred by state law sovereign immunity. The Pennsylvania General Assembly has reaffirmed the sovereign

---

[6] Plaintiff cites only original jurisdiction as the court's basis for hearing her suit. (See Doc. 32 ¶ 2 (citing 28 U.S.C. §§ 1331, 1343)). However, plaintiff's state law claims are necessarily brought pursuant to the court's supplemental jurisdiction. See 28 U.S.C. § 1367(a).

immunity of the Commonwealth, its agencies, and its employees by statute.  See

1 Pa. Cons. Stat. § 2310; Larsen v. State Emps. Ret. Sys., 553 F. Supp. 2d 403, 420

(M.D. Pa. 2008).  The Commonwealth's statutory sovereign immunity is broader in

scope than Eleventh Amendment immunity, extending to state employees "in both

their official *and* individual capacities."  Kintzel v. Kleeman, 965 F. Supp. 2d 601,

606 (M.D. Pa. 2013) (emphasis added) (quoting Larsen, 553 F. Supp. 2d at 420).

The Commonwealth has waived the defense of sovereign immunity for certain

enumerated causes of action, but has not done so for intentional tort claims.  See

42 Pa. Cons. Stat. § 8522.  Sovereign immunity thus bars plaintiff's state law tort

claims against Trooper Laughlin and Commissioner Noonan.

### 2. *Pennsylvania Political Subdivision Tort Claims Act*

The Pennsylvania Political Subdivision Tort Claims Act, 42 Pa. Cons. Stat.

§ 8541 *et seq.*, immunizes local agencies from liability "for damage on account of any

injury to a person or property caused by any act of the local agency or any employee

thereof . . . ."  Id. § 8541.  This governmental immunity extends to employees of local

agencies for acts taken "within the scope of [the employee's] office or duties."  Id.

§ 8545.  The Act exempts from its scope any agency or employee whose injurious act

"constituted a crime, actual fraud, actual malice[,] or willful misconduct."  Id.

§ 8550.

Plaintiff contends broadly that all defendants "have acted willfully or with

malice" and thus cannot avail themselves of the Act's protections.  (Doc. 44 at 13).

The court disagrees with plaintiff's perfunctory response.  The court has herein

concluded that plaintiff fails to state any wrongdoing on the part of a number of defendants, *to wit*: Nurse Walters, Counselor Conner, Officers Patkalitsky, Lewis, Knable, and Houser, Sergeant Benny, Deputy Warden Crisswell, and Warden Zook. <u>See</u> *supra* at 19-20.  Plaintiff's allegations against each of these defendants fall far short of constituting criminal, fraudulent, malicious, or willful conduct.  Similarly, the court has held that plaintiff fails to state a viable claim against Juniata County, Mifflin County, or the Mifflin County Prison Board.  Each of these defendants are entitled to statutory governmental immunity on plaintiff's state law claims.

The inquiry as to the remaining municipal defendants—Lieutenants Weaver and Kearns, Officers Maben and Snook, and Nurse Wert—is more complicated.  At least one district court decision suggests that a finding of reckless indifference may suffice to establish willful misconduct.  <u>See</u> <u>Kruger v. Lancaster Cty.</u>, No. 12-CV-6248, 2015 WL 1021407, at *15 (E.D. Pa. Mar. 9, 2015).  A contrary decision holds that reckless indifference does not evince "the requisite intent to injure" envisioned by the willful misconduct standard.  <u>See</u> <u>Keohane v. Lancaster Cty.</u>, No. 07-3175, 2010 WL 3221861, at *18 (E.D. Pa. Aug. 13, 2010).  The court finds that any determination whether immunity should extend to Lieutenants Weaver and Kearns, Officers Maben and Snook, and Nurse Wert must await a more fully developed record.  The court will reject the remaining defendants' governmental

immunity defense at this juncture, without prejudice to defendants' right to reassert the defense if warranted at a later stage of this litigation.[7]

### 3.    *Medical Negligence*

Nurse Wert lastly seeks dismissal of Count IV for failure to state a claim, arguing that the amended complaint sets forth nothing more than a bare recitation of the elements of a medical negligence claim.  (See Doc. 40 at 16-17).  On this score, the court is compelled to agree with Nurse Wert.  The amended complaint does not articulate an applicable standard of care, nor does it identify particular conduct to be measured against that standard.  (See Doc. 32 ¶¶ 215-219).  Plaintiff offers no meaningful defense of this claim in her opposition papers, rejoining only that "[d]efendants should already know the standard of care . . . [and] know that expert testimony will be used to explain how the standard of care was not met."  (Doc. 44 at 14).  The court will dismiss plaintiff's medical negligence claim against Nurse Wert, as even the most deferential interpretation of plaintiff's *allegata* cannot satisfy her Rule 12 pleading burden.

### C.    Motion to Strike

The Mifflin County defendants further move the court to strike certain paragraphs of plaintiff's amended complaint which they deem "immaterial and impertinent."  (Doc. 40 at 19-21).  Specifically, defendants ask the court to strike

---

[7] Nurse Wert separately cites to several federal district court and state court decisions for the proposition that medical malpractice "does not fall within any of the governmental immunity exceptions at 42 PA. CONS. STAT. § 8542(b)."  (Doc. 40 at 18).  However, plaintiff's theory of the case falls within § 8542(a), pertaining to willful misconduct, not the enumerated waivers of § 8542(b).  (See Doc. 44 at 13).

paragraphs 24 through 26, setting forth various prison suicide statistics, as well as

paragraphs 63 through 65, and paragraph 67, which contain allegations regarding

the scientific and legal history of bath salt consumption in the United States.  (See

Doc. 32 ¶¶ 24-26, 63-65, 67).

A Rule 12(f) motion to strike on materiality or impertinence grounds will

generally be denied "unless the challenged allegations have no possible relation or

logical connection to the subject matter of the controversy."  5C WRIGHT ET AL.,

FEDERAL PRACTICE & PROCEDURE § 1382.  Prejudice to the moving party is the

touchstone of the court's analysis of such motions.  See Karpov, 307 F.R.D. at 348.

Plaintiff's statistical allegations are relevant to this litigation in only the most

general sense, but defendants articulate no prejudice flowing from inclusion of the

enumerated paragraphs in plaintiff's amended complaint.  The court will thus deny

defendants' motion to strike.

### D.    Leave to Amend

The court harbors moderate doubt concerning plaintiff's ability to cure

the deficiencies identified in this memorandum, particularly given that this matter

presents on an amended complaint.  Nonetheless, the Third Circuit Court of

Appeals requires courts to grant leave to amend in civil rights cases when a curative

amendment is conceivable.  See Fletcher-Harlee Corp., 482 F.3d at 251; Grayson,

293 F.3d at 108.  To the extent plaintiff's claims are factually rather than legally

flawed, the court will grant plaintiff a final opportunity to amend her pleading with

respect to the claims dismissed herein, as more fully articulated in the forthcoming order.

**IV.**   **Conclusion**

The court will grant in part and deny in part defendants' motions (Docs. 34-36) to dismiss.  An appropriate order shall issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated:        August 31, 2016