# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TAWNA Z. NEALMAN, as the<br>Personal Representative of the Estate<br>of Benjamin Shelley Nealman, | : | CIVIL ACTION NO. 1:15-CV-1579 |
| | : | |
| | : | (Chief Judge Conner) |
| | : | |
| **Plaintiff** | : | |
| | : | |
| v. | : | |
| | : | |
| ROBERT MABEN, CHRISTIAN<br>Z. SNOOK, TIFFANIE N. WERT,<br>MICHELLE K. HUFFMAN, and<br>BARRY KEARNS, | : | |
| | : | |
| | : | |
| | : | |
| **Defendants** | : | |

## <u>MEMORANDUM</u>

Plaintiff Tawna Z. Nealman commenced this civil rights action on behalf of the estate of her late husband, Benjamin Shelley Nealman. Plaintiff asserts various constitutional and state-law claims against several employees of the Mifflin County Correctional Facility arising from Nealman's suicide during his detention in August 2013. The parties have filed cross-motions for summary judgment as to all claims and parties remaining.

# I.     <u>Factual Background & Procedural History</u>[1]

The material facts underlying this litigation are largely undisputed.

On August 13, 2013, at around 2:00 p.m., Pennsylvania State Police Trooper Ryan Laughlin ("Trooper Laughlin") was dispatched to Impressions Printings Company, a business located in Mifflintown, Pennsylvania, for reports of a possible shooting. (Doc. 84 ¶ 1; Doc. 94 ¶ 1). On arrival, Trooper Laughlin observed plaintiff's late husband, Benjamin Shelley Nealman ("Nealman"), "lying on the floor behind a desk in the back of the office, clenching a stun gun and a pair of brass knuckles."[2] (Doc. 84 ¶ 2; Doc. 94 ¶ 2). Nealman was confused, sweating, and breathing heavily, and he claimed that someone had attempted to shoot him from across the river, that his stun gun had been shot, and that he had been shot in the back. (Doc. 84 ¶¶ 3-5;

---

[1] Local Rule 56.1 requires that a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 be supported "by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried." LOCAL RULE OF COURT 56.1. A party opposing a motion for summary judgment must file a separate statement of material facts, responding to the numbered paragraphs set forth in the moving party's statement and identifying genuine issues to be tried. <u>Id.</u> Unless otherwise noted, the factual background herein derives from the parties' Rule 56.1 statements of material facts. (<u>See</u> Docs. 84, 86, 92, 94). To the extent the parties' statements are undisputed or are supported by uncontroverted record evidence, the court cites directly to the statements of material facts.

[2] Trooper Laughlin testified that this was not the first time that he had encountered Nealman: a few days earlier, Trooper Laughlin and his partner were dispatched to Nealman's home after plaintiff called and reported that Nealman thought that "there were people on the roof" and was "scaring the kids." (<u>See</u> Doc. 84-1, Laughlin Dep. 15:16-17:17). Trooper Laughlin testified that, after he and his partner found Nealman walking along a ramp toward a nearby bridge, they placed him in their patrol car and dropped him off at a friend's house. (<u>Id.</u> at 16:2-9, 82:9-21).

Doc. 94 ¶¶ 3-5).  Trooper Laughlin observed no gunshot wounds and concluded that Nealman was "simply delusional."  (Doc. 84 ¶¶ 4, 6; Doc. 94 ¶¶ 4, 6).  Nealman told Trooper Laughlin that he had ingested bath salts, Vicodin, and No-Doz pills earlier that day.  (Doc. 84 ¶ 7; Doc. 94 ¶ 7).

Trooper Laughlin arrested Nealman on charges of use or possession of drug paraphernalia, possession of an offensive weapon, and disorderly conduct, (Doc. 84 ¶ 8; Doc. 94 ¶ 8; see Doc. 84-25 at 2-3), and transported him first to the state police barracks and then to a magisterial district court for arraignment, (Doc. 84 ¶¶ 9, 12; Doc. 94 ¶¶ 9, 12).  After Nealman was arraigned, Trooper Laughlin transported him to Mifflin County Correctional Facility ("MCCF").  (Doc. 84 ¶ 14; Doc. 94 ¶ 14).  Nealman was quiet during the transports and did not exhibit any unusual behavior or make any statements suggesting an intent to harm himself or others.  (Doc. 84 ¶¶ 10-11, 13, 15).[3]  Trooper Laughlin testified that he had no concerns that Nealman was at risk of harming himself or others when he dropped Nealman off at MCCF.  (See Laughlin Dep. 58:11-19, 63:7-19).

The intake procedure at MCCF consists of two phases: booking and classification.  (Doc. 84 ¶ 17; Doc. 94 ¶ 17).  Booking is the "initial screening and observation of each new commitment and occurs at or near the time of intake."  (Doc. 84 ¶ 18; Doc. 94 ¶ 18).  The classification phase follows and may take up to 14 days to complete.  (Doc. 84 ¶ 18; Doc. 94 ¶ 18).  Classification produces the ultimate

---

[3] Plaintiff denies this portion of defendants' statement of facts but cites no contrary record evidence to suggest that Nealman's behavior *during the transports* was out of the ordinary or otherwise concerning.  (See Doc. 94 ¶¶ 10-11, 13, 15).

inmate housing assignment after review and approval by medical, counseling, and security staff. (Doc. 84 ¶ 18; Doc. 94 ¶ 18). The first steps upon arrival of a new commitment are for the booking officer to verify the identity of the transporting officer and the detainee and to examine all legal documents accompanying the detainee "to insure they meet proper standards." (Doc. 86-3 at 1).

During the intake process, prison officials must complete a number of screening forms, including a Classification Checklist/Reception Checklist (the "Reception Checklist"), Initial Receiving Screening Form, Physical Examination Form, and Suicide Screening Questionnaire. (Doc. 84 ¶ 19; Doc. 94 ¶ 19). Officials must also input certain data into the facility's computerized offender management system. (See Doc. 84 ¶ 19; Doc. 94 ¶ 19). MCCF policy states that officers must assess the detainee based on "personal observations and information reported by the arresting officer or the transporting authority." (Doc. 86-6). MCCF staff testified that, in practice, they rely "predominately" on their own observations to "gauge the demeanor of the inmate." (Doc. 86-16, Snook Dep. 32:2-33:2; Doc. 86-17, Kearns Dep. 24:6-27:2; see also Doc. 86-14, Maben Dep. 61:22-63:9).

Correctional officer Robert Maben ("Maben") was the booking officer on duty when Nealman arrived at MCCF. (Doc. 84 ¶ 26; Doc. 85 ¶ 5; Doc. 92 ¶ 5; Doc. 94 ¶ 26). Lieutenant Michelle K. Huffman ("Huffman"), formerly known as Michelle K. Weaver, was the shift supervisor. (Doc. 84 ¶ 27; Doc. 86 ¶ 6; Doc. 92 ¶ 6; Doc. 94 ¶ 27). Maben completed the first ten questions on Nealman's Reception Checklist immediately upon intake. (Doc. 84 ¶¶ 28, 37; Doc. 94 ¶¶ 28, 37). Nealman's completed Reception Checklist is reproduced below:

CLASSIFICATION CHECKLIST          MIFFLIN COUNTY CORRECTIONAL
RECEPTION CHECKLIST                        FACILITY

NAME _Nealman, Benjamin_ RECEIVED FROM _PSP Trooper Laughlin_ DATE _8-13-13_ TIME _18:00_

OBSERVATION AND COMMITMENT INFORMATION                    Yes    No

1. Obvious pain, bleeding ?
2. Wearing medical tags ?
3. Skin in poor condition (wounds, rash, vermin, swelling)?
4. Wearing prosthesis(artificial limb)?
5. Carrying medication ?
6. Signs of illness( eyes glassy, bloodshot, pupils dilated or constricted) ?
7. Signs of possible mental disturbance (confused, anxious, disoriented, fearful, exagerated body
   movements-slow or rapid, rigidity, unusually tense or suspicious) ?
8. Signs of possible intoxication-alcohol or drugs(rapid, shallow breathing, staggering, dizziness,
   tremors, thick, slurred speech) ?
9. Signs of possible suicide (depression, fear, scars suggesting suicide attempts, history of suicide
   attempts/ threats, expressed intent) ?
10. Signs of assaultiveness( verbally abusive, uncooperative, threatening, history of violence)?
11. Escape history, including attempts or threats ?
12. Separations necessary ?
13. Any other problems?

Observation concerning the inmate during reception processing ?      KEEP INMATE SEPERATED FROM :
open sores on face, took Bath Salts last                              None
at 02:30 (app) on 08-13-13

(Doc. 86-7).  As the form reflects, Maben checked "no" for "signs of possible

mental disturbance" and "signs of possible suicide."  (Id.)  Maben checked "yes"

for "skin in poor condition" and "signs of possible intoxication."  (Id.)  In a section

titled "Observation concerning the inmate during reception processing," Maben

wrote "open sores on face, took bath salts last at 2:30 (app) on 8-13-13."  (Id.)  Maben

testified that, other than these observations, he did not recall anything "out of the

ordinary" as to Nealman's booking.  (Doc. 84 ¶ 34; Maben Dep. 101:18-102:1).

     The bottom section of the Reception Checklist form states: "If yes is

answered to the following questions, make immediate referral as indicated."  (Doc.

86-7).  The form then assigns a department to each of the 13 enumerated questions.

For example, "yes" answers to questions 1 through 6 are referred to the medical

department, and "yes" answers for questions 7 through 11 must be referred to a

psychiatrist or counselor.  (Id.)  MCCF staff explained that an "immediate referral"

requires the detainee to be seen by the assigned department within 14 days of

admission.  (Doc. 84 ¶ 24).  The parties dispute whether immediate referral is

mandated for *any* "yes" answer, as the form's language suggests, or only when,

in a supervisor's discretion, it appears that the detainee is in immediate need of a

mental health evaluation.  (See Doc. 84 ¶¶ 23-25; Doc. 86 ¶¶ 55-65; Doc. 92 ¶¶ 55-65;

Doc. 94 ¶¶ 23-25).

Intake booking officers often complete the initial booking steps—such as

searches, showers, and the first ten questions of the Reception Checklist—and

leave the remaining steps to be completed by an officer on a later shift.  (See Maben

Dep. 12:21-13-8; see also Doc. 84 ¶ 21; Doc. 94 ¶ 21).  Maben testified that he followed

this procedure in Nealman's case because MCCF was "extremely busy" that night.[4]

(See Maben Dep. 13:2; Doc. 84 ¶ 37; see also Doc. 86 ¶ 41; Doc. 92 ¶ 41; Doc. 94 ¶ 37).

After Maben completed the first part of the Reception Checklist, he placed Nealman

in a holding cell in the booking area overnight.  (See Doc. 84 ¶ 38; Doc. 94 ¶ 38).

Maben issued a spork, knife, two bedsheets, and a pillowcase to Nealman.  (Doc. 86

¶ 48; Doc. 92 ¶ 48).

Correctional officer Christian Z. Snook ("Snook") completed the booking

process with Nealman on the morning of August 14, 2013.  (Doc. 84 ¶ 40; Doc. 94

---

[4] Another correctional officer explained that, if an individual is intoxicated
upon arrival at MCCF, the intake booking officer may place that individual in a
holding cell overnight to "detox" before completing the booking process.  (Snook
Dep. 18:24-19:7, 29:6-31:16).  That officer added that it was "likely" that Nealman's
bath-salts intoxication informed Maben's decision to defer booking until the next
morning, (see id. at 19:23-20:7), but that he did not know that for a fact.

¶ 40). While completing the Initial Receiving Screening Form, Nealman disclosed (and Snook documented) that he had ingested bath salts the day before and had attempted suicide 13 years prior. (Doc. 84 ¶¶ 42-43; Doc. 94 ¶¶ 42-43; <u>see</u> Doc. 84-5). Snook noted that Nealman was cooperative, relaxed, and denied that he was currently suicidal. (Doc. 84 ¶ 44; Doc. 94 ¶ 44; <u>see</u> Doc. 84-5).

Snook also completed a Suicide Screening Questionnaire with Nealman. (Doc. 84 ¶ 45; Doc. 94 ¶ 45; <u>see</u> Doc. 84-7). The questionnaire includes 18 "yes or no" prompts with space for comments. (Doc. 84-7). Nealman's questionnaire appears below:

| Booking# 13-00756 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Last Name | First Name | Middle Name | Affix | Date of Birth | Sex | Screening Date/Time | Screening Officer | |
| NEALMAN | BENJAMIN | S | | 07/24/1978 | M | 8/14/2013 09:05:26 | SNOOK, CHRISTIAN | |

| Detainee showed serious psychiatric problems during prior incarceration | | Result | Low risk of suicide |
|---|---|---|---|

| Order | Question Asked | Y/N | Comment |
|---|---|---|---|
| 1 | Arresting or transporting officer believes subject may be a suicide risk | N | |
| 2 | Lacks close family/friends in community | N | |
| 3 | Experienced a significant loss within last 6 months(job,death, relationship) | N | |
| 4 | Worried about major problems other than legal situation (terminal illness) | N | |
| 5 | Family member or significant other has attempted or committed suicide | N | |
| 6 | Has psychiatric history (psychotropic medication or treatment) | Y | 2000 - SUICIDE ATTEMPT |
| 7 | Holds position of respect in community and alleged crime is shocking | N | |
| 8 | Expresses thoughts about killing self. | N | |
| 9 | Has a suicide plan or an instrument to commit suicide in possession. | N | |
| 10 | Has previous suicide attempt > 3 months ago. (check wrists & note method). | Y | OVERDOSE |
| 11 | Has attempted suicide within the last 3 months. (check wrists & note method). | N | |
| 12 | Shows signs of depression (crying, emotional flatness). | N | |
| 13 | Appears overly anxious, afraid, or angry | N | |
| 14 | Appears to feel unusually embarrassed or ashamed. | N | |
| 15 | Is acting and/or talking in a strange manner. (Cannot focus attention). | N | |
| 16 | Is apparently under the influence of alcohol or drugs. | N | |
| 17 | If yes to #16, is subject incoherent or showing signs of withdrawal/mental ill? | N | |
| 18 | Expresses feelings there is nothing to look forward to in future. | N | |
| | Total Weighted Score | 3 | |

(<u>Id.</u>) Snook checked "yes" for both "psychiatric history" and "previous suicide attempt > 3 months ago" based on Nealman's disclosure of an attempted suicide by overdose in 2000. (<u>Id.</u>) While completing the questionnaire, Nealman told Snook that he and his wife were separated. (Doc. 84 ¶ 46; Doc. 94 ¶ 46). Snook indicated

that Nealman was not worried about major life problems other than his criminal case; that he did not show signs of depression or appear anxious, afraid, or angry; and that he did not express feelings of despondency. (See Doc. 84-7). Snook noted that Nealman again denied current suicidality. (Doc. 84 ¶ 49; Doc. 84-7).

Snook observed that Nealman "was compliant, generally clean, [and] spoke well" and that "nothing really sticks out in my mind when I processed him that would have caused any concern or would have been anything out of the ordinary." (Doc. 84 ¶ 40). Based on the questionnaire, Nealman was determined to be a "low risk of suicide" and cleared for general population with routine medical and counseling referrals. (Doc. 84 ¶¶ 50-53; Doc. 94 ¶¶ 50-53). During booking, Snook explained to Nealman the process for obtaining healthcare services at MCCF if Nealman wished to do so. (Doc. 84 ¶ 54; Doc. 94 ¶ 54). Lieutenant Barry Kearns ("Kearns"), Snook's shift supervisor, reviewed the forms completed by Snook and approved Nealman's placement in general population pending routine medical and mental health reviews. (Doc. 84 ¶¶ 41, 55; Doc. 94 ¶¶ 41, 55). Neither Snook nor Kearns made "immediate referrals" based on the two "yes" answers (concerning skin condition and intoxication) on Nealman's reception checklist. (See Snook Dep. 119:18-120:9).

Tiffanie Wert ("Wert"), a registered nurse at MCCF, met with Nealman next for a medical review. (Doc. 84 ¶ 56; Doc. 94 ¶ 56; see Doc. 84-6). Wert examined Nealman and agreed with the recommendation to place him in general population. (Doc. 84 ¶ 56; Doc. 94 ¶ 56). Wert reviewed the booking paperwork, including the Reception Checklist and the Initial Receiving Screening Form, and discussed

8

Nealman's drug use and prior suicide attempt with him. (Doc. 84 ¶¶ 58-59; Doc. 94 ¶¶ 58-59). Nealman disclosed that he had consumed bath salts the day before and had attempted suicide by overdose in 2000. (Doc. 84 ¶¶ 60-61; Doc. 94 ¶¶ 60-61). Wert did not observe signs of hallucination, shaking, or any other symptoms of mental illness during the examination. (Doc. 84 ¶ 62; Doc. 94 ¶ 62). Nealman expressly denied that he was currently suicidal when questioned by Wert, (Doc. 84 ¶ 63; Doc. 94 ¶ 63), and Wert testified that she had no concern that Nealman was a danger to himself or others based on the examination. (Doc. 84 ¶ 64; Doc. 94 ¶ 64).

Nealman was placed in "E-Block," the special needs housing unit, pending completion of a mental health examination and final classification. (Doc. 84 ¶¶ 66-67; Doc. 94 ¶¶ 66-67; Snook Dep. 54:12-55:4, 76:21-77:16). On August 15, 2013, two days after his arrest, Nealman called his mother. (See Doc. 84 ¶ 73; Doc. 94 ¶ 73). Nealman's mother testified that Nealman was "lucid" and "sober" during the call but that he "didn't sound right" and seemed "down." (Doc. 84 ¶ 74; Doc. 94 ¶ 74). On August 16, 2013, Nealman called Colello Bail Bonds at approximately 9:30 a.m. and again at approximately 11:35 a.m. (Doc. 84 ¶¶ 75-76; Doc. 94 ¶¶ 75-76). The bondsman informed Nealman during the second call that he was unable to post Nealman's bail. (Doc. 84 ¶ 77; Doc. ¶ 77).

At 12:23 p.m., surveillance footage shows Nealman entering his cell. (Doc. 84 ¶ 79; Doc. 94 ¶ 79). At 12:37 p.m., correctional officer James M. Lewis ("Lewis") discovered Nealman hanging by a bedsheet in his cell. (Doc. 84 ¶ 80; Doc. 94 ¶ 80). Lewis immediately called a "code blue," and medical and corrections staff promptly responded. (Doc. 84 ¶ 81; Doc. 94 ¶ 81). Emergency medical services arrived and

transported Nealman to Lewistown Hospital. (Doc. 84 ¶ 82; Doc. 94 ¶ 82). Nealman

passed away at Lewiston Hospital on August 20, 2013. (Doc. 84 ¶ 83; Doc. 94 ¶ 83).

Plaintiff commenced this action on August 12, 2015, and the case is

currently proceeding on plaintiff's second amended complaint. After Rule 12(b)

motion practice and a stipulation between the parties, the following claims and

defendants remain: a claim for deliberate indifference to Nealman's particular

vulnerability to suicide pursuant to 42 U.S.C. § 1983 against all defendants (Count

1); a claim for supervisory liability pursuant to 42 U.S.C. § 1983 against Huffman

and Kearns (Count 2); a state-law claim for medical negligence against Wert (Count

3); and a state-law claim for wrongful death against all defendants (Count 4). The

parties' cross-motions for summary judgment on all remaining claims are ripe for

disposition.

## II.    <u>Legal Standard</u>

Through summary adjudication, the court may dispose of those claims

that do not present a "genuine dispute as to any material fact" and for which a

jury trial would be an empty and unnecessary formality. FED. R. CIV. P. 56(a).

The burden of proof tasks the non-moving party to come forth with "affirmative

evidence, beyond the allegations of the pleadings," in support of its right to relief.

<u>Pappas v. City of Lebanon</u>, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); <u>see</u> <u>also</u> <u>Celotex</u>

<u>Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986). This evidence must be adequate, as a

matter of law, to sustain a judgment in favor of the non-moving party on the claims.

<u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250-57 (1986); <u>Matsushita Elec. Indus.</u>

Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986). Only if this threshold is met may the cause of action proceed. See Pappas, 331 F. Supp. 2d at 315.

Courts are permitted to resolve cross-motions for summary judgment concurrently. See Lawrence v. City of Phila., 527 F.3d 299, 310 (3d Cir. 2008); see also Johnson v. Fed. Express Corp., 996 F. Supp. 2d 302, 312 (M.D. Pa. 2014); 10A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 2720 (3d ed. 2015). When doing so, the court is bound to view the evidence in the light most favorable to the non-moving party with respect to each motion. FED. R. CIV. P. 56; Lawrence, 527 F.3d at 310 (quoting Rains v. Cascade Indus., Inc., 402 F.2d 241, 245 (3d Cir. 1968)).

III. **Discussion**

Plaintiff's remaining claims are twofold: *first*, a Section 1983 claim against all defendants for deliberate indifference to a particular vulnerability to suicide; and *second*, state-law claims for medical negligence against Wert and for wrongful death against all defendants. We address each claim in turn.

A. **Constitutional Claims**

Plaintiff's core claim arises under Section 1983 of Title 42 of the United States Code. Section 1983 creates a private cause of action to redress constitutional wrongs committed by state officials. 42 U.S.C. § 1983. The statute is not a source of substantive rights, but serves as a mechanism for vindicating rights otherwise protected by federal law. Gonzaga Univ. v. Doe, 536 U.S. 273, 284-85 (2002); Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996). To establish Section 1983 liability, a plaintiff must prove a deprivation of a "right secured by the Constitution and the

laws of the United States . . . by a person acting under color of state law." <u>Kneipp</u>, 95 F.3d at 1204 (quoting <u>Mark v. Borough of Hatboro</u>, 51 F.3d 1137, 1141 (3d Cir. 1995)).  Defendants do not dispute their status as state actors.  Our sole inquiry is whether any defendants' conduct deprived Nealman of rights secured by the United States Constitution.

### 1.  *Vulnerability-to-Suicide Claim*

The suicide of a pretrial detainee may support a Fourteenth Amendment claim against custodial officers who are aware of and act with reckless indifference to a detainee's "particular vulnerability" to suicide.  The Third Circuit Court of Appeals recognized liability for such claims in <u>Colburn v. Upper Darby Township</u> ("<u>Colburn I</u>"), 838 F.2d 663 (3d Cir. 1988), and later elaborated on the applicable standard in <u>Colburn v. Upper Darby Township</u> ("<u>Colburn II</u>"), 946 F.2d 1017 (3d Cir. 1991), and <u>Woloszyn v. County of Lawrence</u>, 396 F.3d 314 (3d Cir. 2005).  To prevail on a Section 1983 custodial-suicide claim, a plaintiff must prove: *first*, the detainee had a "particular vulnerability" to suicide; *second*, custodial officers "knew or should have known" of that vulnerability; and *third*, custodial officers "acted with reckless indifference" to the known risk of suicide.  <u>Woloszyn</u>, 396 F.3d at 319 (quoting <u>Colburn II</u>, 946 F.2d at 1023).  Plaintiff's claim fails on at least two elements.

### a.  **"Particular Vulnerability"**

Whether a pretrial detainee presents with a "particular vulnerability" to suicide depends on the "degree of risk inherent in the detainee's condition." <u>Colburn II</u>, 946 F.2d at 1024.  The particular vulnerability standard requires "a

strong likelihood, rather than a mere possibility," that the detainee will engage

in self-harm.  Id. (citations omitted).  The propensity toward suicide "must be 'so

obvious that a lay person would easily recognize the necessity for' preventative

action."  Id. (citing Monmouth Cty. Corr. Inst. Inmates v. Lanzaro, 834 F.2d 326, 347

(3d Cir. 1987)).

Plaintiff begins her particular-vulnerability argument by emphasizing

that Nealman belonged to several demographics with statistically higher rates

of suicide, including males, inmates, and criminals.  (Doc. 95 at 5 (citing WORLD

HEALTH ORGANIZATION, DEPARTMENT OF MENTAL HEALTH AND SUBSTANCE ABUSE,

PREVENTING SUICIDE IN JAILS AND PRISONS (2007), https://www.who.int/mental

_health/prevention/suicide/resource_jails_prisons.pdf)).  But proof that a detainee

belonged to a demographic with higher rates of suicide cannot alone suffice to make

the requisite vulnerability showing.  See, e.g., Wargo v. Schuylkill County, 348 F.

App'x 756, 759 (3d Cir. 2009) (nonprecedential); Thomas v. Fayette County, No. 2:14-

CV-551, 2016 WL 3639887, at *13 (W.D. Pa. July 8, 2016).  If these correlates were

enough, *any* male arrested and detained for a crime would be deemed a suicide risk.

Plaintiff must adduce sufficient evidence from which correctional officers should

have known that Nealman himself was inclined toward self-harm.

The Third Circuit's most recent custodial suicide decision establishes

the quintessential example of a particular vulnerability to suicide.  In Palakovic

v. Wetzel, 854 F.3d 209 (3d Cir. 2017), the decedent

> disclosed to prison personnel his history of suicide
> attempts, including an attempt in the recent past, his
> periodic thoughts of both self-harm and suicide, and

> even that he had made specific plans about how he
> would go about killing himself. He had been diagnosed
> with an array of serious mental illnesses, exhibited signs
> of depression, shared his suicidal thoughts with prison
> staff, and expressed a wish to die. Unsurprisingly, after
> the prison considered these indications, it labeled him a
> "suicide behavior risk."

Palakovic, 854 F.3d at 229-30. The decedent's parents alleged that he requested

counseling but was ignored, and the record indicated that other inmates had

nicknamed him "Suicide" based on his apparent inclination toward self-harm. Id.

at 228, 230. Yet prison officials failed to provide mental health treatment to the

decedent, who later died by suicide in solitary confinement. Id. at 217.

The district court determined that the plaintiffs had not adequately alleged

a particular vulnerability to suicide. The Third Circuit reversed, in forceful terms,

holding:

> When a mentally ill, depressed person has attempted to
> kill himself multiple times, has engaged in self-harm,
> declares he has been thinking about killing and harming
> himself, and has made an actual plan of how he would
> carry out his own suicide, it cannot be said as a matter of
> law that the risk of suicide is nothing more than a "mere
> possibility."

Id. at 230 (citing Woloszyn, 396 F.3d at 322). The court added: "If we were to

conclude that [these] circumstances were insufficient to allege a 'particular

vulnerability to suicide,' it is difficult to imagine how any plaintiff could ever

succeed in doing so." Id.

Colburn II and Woloszyn stand in contrast as examples of circumstances

which did not demonstrate a particular vulnerability to suicide. In Colburn II,

the decedent was arrested for public intoxication. The record showed that the

14

decedent was "calm and subdued" in transit to the police station and "calm and cooperative" with correctional officers. <u>Colburn II</u>, 946 F.2d at 1020-21. The officers knew that the decedent was intoxicated and knew that, after arriving at the station, she had attempted to ingest three Valium pills and was discovered to have a single bullet in her pocket. <u>Id.</u> at 1020. They also knew that she was being evicted and had argued with her boyfriend and her mother that day. <u>Id.</u> at 1020-21. Although the decedent was again "calm" during a cell check at 8:30 p.m., a custodial officer heard a "pop" shortly before 9:00 p.m. and discovered the decedent dead in her cell from a self-inflicted gunshot wound. <u>Id.</u> at 1021. The Third Circuit held that intoxication alone cannot be equated with a particular vulnerability to suicide and that neither the attempt to ingest three pills nor the possession of a single bullet supply the "additional factor necessary to make her vulnerability to suicide obvious." <u>Id.</u> at 1026-27.

The court reached the same result in <u>Woloszyn</u>. The decedent was arrested for attempted burglary. He was "in good spirits" and was "talking and joking" with arresting officers upon arrival at the county jail. <u>Woloszyn</u>, 396 F.3d at 316-17. He had denied being suicidal to a correctional officer, and he was described as "polite, cooperative, alert and not agitated" in an intake medical assessment. <u>Id.</u> at 316-17. The intake officer did note, however, that the decedent had expressed remorse, seemed distant, was unresponsive to questions, suggested that he had "failed as a father and a person," and indicated that he was intoxicated and had been on a 24-hour drug and alcohol binge, during which he consumed "every drug possible from alcohol to heroin, to crack cocaine and acid." <u>Id.</u> at 317. Just over an hour after he

was placed in a holding cell, the decedent was found hanging by a bedsheet and declared dead.  Id. at 318.  Even these circumstances, the Third Circuit held, were insufficient—"without more"—to show a strong likelihood that suicide may occur. Id. at 323.[5]

Against this legal backdrop, no reasonable juror could find that Nealman had a particular vulnerability to suicide of which defendants should have been aware.  We note at the outset that the Rule 56 record paints a materially different picture than the amended complaint that survived Rule 12 scrutiny.  At that stage, we concluded that "Nealman *may* have been particularly vulnerable to self-harm and suicide" based on plaintiff's allegations—the only facts then available—that Nealman presented with numerous indicators of suicidality of which defendants should have been aware, including known, delusional, and psychotic behavior; recent marital discord; depression; a previous mental health hospitalization; and a prior suicide attempt.  Nealman v. Laughlin, No. 1:15-CV-1579, 2016 WL 4539203, at *8 (M.D. Pa. Aug. 31, 2016) (emphasis added).  The Rule 56 record presents a starkly different view of Nealman's mental state and behavior in the days preceding his suicide.

---

[5] An unsworn statement from an inmate in the cell next to the decedent's indicated that the decedent had become "strung out" and "went nuts" shortly after being placed in a holding cell.  Id. at 317-18.  The inmate stated that the decedent "scream[ed] loudly" for at least 45 minutes, indicated that he "needed help" and "needed a counselor," and punched and kicked the furniture in his cell. Id.  The Third Circuit acknowledged that this statement "could raise a genuine issue of material fact" as to the particular-vulnerability element, but affirmed the district court's decision not to consider the statement because it was "not in affidavit form."  Id. at 323.

Plaintiff marshals the following evidence to prove that Nealman was particularly vulnerable to suicide: (1) Nealman was arrested by Trooper Laughlin after engaging in hallucinatory and frantic behavior on the afternoon of August 13, 2013; (2) Nealman had ingested bath salts, Vicodin, and No-Doz earlier in the day; (3) Nealman had attempted suicide by overdose 13 years prior; (4) Nealman and his wife were separated; and (5) Nealman could not make bail. (Doc. 87 at 6-7; Doc. 95 at 5-7). These facts, whether in isolation or *in toto*, are simply not enough to suggest "a *strong likelihood*, rather than a mere possibility," that Nealman would engage in self-harm or attempt suicide. See <u>Colburn II</u>, 946 F.2d at 1024 (emphasis added).

More problematic for plaintiff is what the record does not show. Plaintiff points to no evidence substantiating the claim in her amended complaint—relied on in our Rule 12(b)(6) opinion—that Nealman "suffered from depression" and "had a prior mental health hospitalization." (<u>Compare</u> Doc. 52 ¶ 127 <u>with</u> Doc. 86). No record evidence suggests that Nealman engaged in delusional, hallucinatory, psychotic, unusual, or otherwise concerning behavior at any time between his arrest and his suicide three days later. To the contrary. Nealman was relaxed, cooperative, and compliant, and he exhibited no outward signs of despondency, depression, or suicidality. (<u>See</u> Doc. 84 ¶¶ 34, 40, 44, 62; <u>see</u> <u>also</u> Docs. 84-5, 84-7, 86-7). Nealman indicated in passing that he was separated from his wife, but he did not imply that he was distressed or troubled by this fact. (<u>See</u> Doc. 84 ¶ 46; Doc. 84-7). He denied having worries or concerns about life problems beyond his arrest and new charges. (<u>See</u> Doc. 84 ¶ 46; Doc. 84-7). And he explicitly denied being suicidal three times during the two-day booking process. (Doc. 84 ¶¶ 44, 49, 63; Docs. 84-5,

84-7).  On this record, no reasonable juror could find that there was a "strong likelihood" that Nealman would engage in self-harm.

### b. **"Knew or Should Have Known"**

Assuming *arguendo* that Nealman's intoxication, 13-years-prior suicide attempt, separation from his wife, and inability to make bail combine to establish a particular vulnerability to suicide, (see Doc. 87 at 5-6; Doc. 95 at 4-6), plaintiff has not shown that any defendant knew or should have known of that vulnerability. "Even where a strong likelihood of suicide exists, it must be shown that the custodial officials 'knew or should have known' of that strong likelihood." Colburn II, 945 F.2d at 1024.  The Third Circuit explained in Colburn II that a plaintiff need not show subjective knowledge—only that the defendant should have known that the detainee was particularly vulnerable to suicide.  Id. at 1024-25.  The court articulated the standard as follows:

> It does not refer to a failure to note a risk that would be perceived with the use of ordinary prudence.  It connotes something more than a negligent failure to appreciate the risk of suicide presented by the particular detainee, though something les than subjective appreciation of that risk.  The 'strong likelihood' of suicide must be 'so obvious that a lay person would easily recognize the necessity for' preventative action; the risk of self-inflicted injury must be not only great, but also sufficiently apparent that a lay custodian's failure to appreciate it evidences an absence of any concern for the welfare of his or her charges.

Id. at 1025 (internal citations omitted).

Defendants suggest that the United States Supreme Court's decision in Farmer v. Brennan, 511 U.S. 825 (1994), superseded Colburn II and established a

18

heightened, subjective knowledge standard. (Doc. 83 at 31-32). <u>Farmer</u>, however, concerned a claim for medical deliberate indifference brought under the Eighth Amendment by a convicted prisoner, not a Fourteenth Amendment due process claim by a pretrial detainee. <u>See</u> <u>Farmer</u>, 511 U.S. at 837. The Third Circuit has since explained, in a pretrial-detainee suicide case, that <u>Farmer</u> "does not . . . directly control" Fourteenth Amendment claims by non-prisoners. <u>Woloszyn</u>, 396 F.3d at 321. Our analysis in this Fourteenth Amendment case is thus governed by the standard articulated in <u>Colburn II</u>.[6] Ultimately, plaintiff's claim would fail under either standard.

Plaintiff conceded at the Rule 12 stage that Nealman's intoxication, prior suicide attempt, and marital problems may not, on their own, demonstrate the requisite vulnerability to suicide. <u>See</u> <u>Nealman</u>, 2016 WL 4539203, at *8; (<u>see</u> <u>also</u> Doc. 44 at 5). She instead proceeds on a totality-of-the-circumstances theory, asserting that "this is a case involving numerous factors that in the aggregate[] established a clear vulnerability to suicide." (<u>See</u> Doc. 87 at 5-6; Doc. 95 at 5-6). It follows that, to establish individual liability, plaintiff must show that *each* defendant

---

[6] Defendants cite to <u>Carlos v. York County</u>, No. 1:15-CV-1994, 2017 U.S. Dist. LEXIS 143136, at *42 n.11 (M.D. Pa. Sept. 1, 2017), which cites <u>Farmer</u> and applies a subjective-knowledge standard to a pretrial-detainee suicide claim. Defendants fail to note that <u>Carlos</u> is a pending report and recommendation which, to date, has not been ruled on by the district court. <u>See</u> generally <u>Carlos</u>, No. 1:15-CV-1994. In any event, for the reasons stated, we conclude that the "knew or should have known" standard articulated in <u>Colburn II</u> continues to govern in pretrial-detainee cases. <u>See</u> <u>Woloszyn</u>, 396 F.3d at 321.

was aware of *each* of the facts she claims demonstrate a particular vulnerability to suicide.

Plaintiff has not made this showing as to Maben and Huffman. Maben, the booking officer on duty when Nealman arrived at MCCF, knew nothing other than that Nealman had ingested bath salts earlier in the day and had open sores on his face. (See Doc. 86-7). There is no evidence that Nealman disclosed to Maben his prior suicide attempt or that he was separated from his wife.[7] There is no evidence that Maben (or any other correctional officer) knew that Nealman's wife had called police several days earlier during another episode of hallucinatory behavior. And Maben could not have known at the time of booking that Nealman would later be unable to make bail. As for Huffman, Maben's supervisor, there is no indication whatsoever that she was aware of anything other than the limited facts known to Maben.

Plaintiff's argument as to these defendants seeks to circumvent the Colburn II standard by looking beyond the facts actually known to the defendants to facts that reasonable investigation might have uncovered. Plaintiff intimates, for example, that Maben and Huffman should have gleaned additional information from Trooper Laughlin about Nealman's underlying conduct. (See Doc. 87 at 7-8). But this is not the law. We must instead ask whether the risk of suicide was "so

---

[7] Although plaintiff claims in her responsive statement of facts that "Maben knew that Nealman had a prior credible suicide attempt," (Doc. 94 ¶ 39), plaintiff does not identify, and the court has not found, any record evidence suggesting that Nealman disclosed his prior suicide attempt to Maben or that Maben was otherwise aware of this information.

obvious that a lay person would easily recognize" it.  Colburn II, 946 F.2d at 1025

(citations omitted).  In Colburn II, the court looked not to what information may

have been revealed by closer examination—there, scars indicative of a past suicide

attempt—but what facts were actually known to the defendant at the time.  See id.

at 1026.  On the undisputed evidence before the court, a jury could not find that

Maben or Huffman knew or should have known of Nealman's alleged vulnerability

to suicide.

Snook, Kearns, and Wert knew more.  These defendants knew that

Nealman had attempted suicide 13 years earlier.  (Doc. 84 ¶¶ 43, 47, 55, 60; Doc. 94

¶¶ 43, 47, 55, 60).  They knew that Nealman self-reported using bath salts on the day

of his arrest.  (Doc. 84 ¶¶ 43, 55, 59, 61; Doc. 94 ¶¶ 43, 55, 59, 61).  At least Snook knew

that Nealman was then separated from his wife.  (Doc. 84 ¶ 46; Doc. 94 ¶ 46).  These

defendants could also assume, based on Nealman's continued detention, that he

was unable to make bail.

But as plaintiff herself emphasizes, we do not consider these facts in

isolation.  A jury would be tasked to consider the "totality of the facts presented."

Palakovic, 854 F.3d at 230.  The uncontroverted evidence also shows that these

defendants knew that Nealman appeared relaxed, that he was cooperative with

correctional officers, and that he was "compliant, generally clean, [and] spoke well."

(Doc. 84 ¶¶ 40, 44, 55, 62; Doc. 94 ¶¶ 40, 44, 55, 62; Docs. 84-5, 84-7).  They knew that

he gave no indications of depression, despondency, anxiety, anger, or fear.  (See

Doc. 84 ¶¶ 40, 55, 62, 64; Doc. 94 ¶¶ 40, 55, 62, 64; see also Docs. 84-5, 84-7).  What is

more, these defendants knew that Nealman had explicitly and repeatedly denied

being suicidal to several multiple MCCF staff members. (Doc. 84 ¶¶ 44, 49, 55, 63; Doc. 94 ¶¶ 44, 49, 55, 63; Docs. 84-5, 84-7). On this record, no reasonable juror could find that Snook, Kearns, or Wert knew or should have known that Nealman was vulnerable to suicide. Thus, all remaining defendants are entitled to summary judgment on plaintiff's vulnerability-to-suicide claim for this additional reason.

### 2.    *Supervisory Liability*

A supervisory defendant cannot be held liable for the conduct of a subordinate on a theory of *respondeat superior*. Parkell v. Danberg, 833 F.3d 313, 330 (3d Cir. 2016) (citing Chavarriaga, 806 F.3d at 227). Supervisory liability will attach in only one of two ways: *first*, when a supervisor "established and maintained a policy, practice[,] or custom which directly caused the constitutional harm"; and, *second*, when the supervisor either participated in, directed, or "had knowledge of and acquiesced in their subordinates' violations." Id. (quoting Santiago, 629 F.3d at 129 n.5). Thus, supervisory liability is contingent on proof of an underlying constitutional violation. See Grazier *ex rel.* White v. City of Philadelphia, 328 F.3d 120, 124 (3d Cir. 2003). Because we have found that plaintiff failed to establish two constituent elements of her constitutional claim against the individual defendants, Kearns and Huffman are also entitled to summary judgment on the supervisory liability claims against them.

### B.    State-Law Claims

Plaintiff asserts two state-law tort claims which are largely derivative of her Section 1983 claims: a medical negligence claim against Wert, and a wrongful death claim against all defendants. Defendants invoke the Pennsylvania Political

Subdivision Tort Claims Act ("PSTCA"), 42 PA. CONS. STAT. § 8541 *et seq.*, as well as several merits defenses, in response to these claims.

The PSTCA immunizes local agencies from liability for damage "on account of any injury to a person or property caused by any act of the local agency or an employee thereof or any other person." Id. § 8541. The PSTCA exempts from its protective scope any employee whose act constitutes "a crime, actual fraud, actual malice or willful misconduct." Id. § 8550; see Sanford v. Stiles, 456 F.3d 298, 315 (3d Cir. 2006). Willful misconduct is more than reckless or deliberate indifference. See Bright v. Westmoreland County, 443 F.3d 276, 287 (3d Cir. 2006) (citing Williams v. City of Philadelphia, 569 A.2d 419, 421-22 (Pa. Commw. Ct. 1995)). Rather, willful misconduct includes only that conduct that shows that an employee "desired to bring about the result that followed" or "was aware that it was substantially certain to follow, so that such desire can be implied." Sanford, 456 F.3d at 315 (quoting Renk v. City of Pittsburgh, 641 A.2d 289, 293 (Pa. 1994)). It is synonymous with an "intentional tort." Id.

At the Rule 12(b)(6) stage, we held that resolution of the PSTCA immunity question—particularly as to each defendant's *mens rea*—must await a more fully developed factual record. See Nealman, 2016 WL 4539203, at *13. Now, with the full Rule 56 record before us, there is no doubt that the remaining defendants are entitled to statutory immunity. Even if we were to accept plaintiff's interpretation of MCCF's policies and her assertion that Nealman qualified for but did not receive an immediate mental health referral, her claim at best sounds in negligence. The record simply does not establish that Maben, Snook, Wert, Huffman, or Kearns

engaged in anything resembling "a crime, actual fraud, [or] actual malice" toward Nealman, see 42 PA. CONS. STAT. § 8550, that any defendant "desired to bring about" Nealman's suicide, see Sanford, 456 F.3d at 315 (quoting Renk, 641 A.2d at 293), or that any defendant had reason to believe that Nealman's suicide was the "substantially certain" consequence of their conduct, see id. Accordingly, Maben, Snook, Wert, Huffman, and Kearns are entitled to summary judgment as to plaintiff's state-law tort claims.

IV.  **Conclusion**

We are not unsympathetic to plaintiff's loss. Ultimately, however, plaintiff has not shown that responsibility for that loss lies with the defendants. We will thus grant defendants' motion (Doc. 82) for summary judgment in its entirety, deny plaintiff's cross-motion (Doc. 85) in its entirety, and enter judgment in favor of defendants on all remaining claims. An appropriate order shall issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated:     September 30, 2019